Ernesto **RIVERA**, Petitioner,

v.

**COMMISSIONER OF SOCIAL SECURITY**, Respondent.

No. 06 Civ. 1354(RJS)(HBP).

United States District Court, S.D. New York.

July 21, 2010.

---

William Peairs Gottlieb, Axelrod and Gottlieb, New York, NY, for Petitioner.

Leslie A. Ramirez-Fisher, United States Attorney's Office, Southern District of New York, New York, NY, for Respondent.

## ORDER

RICHARD J. SULLIVAN, District Judge:

Plaintiff Ernesto Rivera commenced this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits and Supplemental Security Income. Plaintiff's complaint was filed on February 21, 2006. The case was originally assigned to the Honorable Kenneth M. Karas, District Judge and reassigned to the docket of the undersigned on September 4, 2007.

On January 4, 2008, Defendant filed a motion and Plaintiff filed a cross-motion for judgment on the pleadings pursuant to Federal Rule 12(c) of Civil Procedure. On January 8, 2009, the Court referred this case to Magistrate Judge Henry B. Pitman for a Report and Recommendation (the "Report").

On June 21, 2010, Judge Pitman issued the Report recommending that Defendant's motion be denied and Plaintiff's motion be granted to the extent of remanding the action to the Commissioner "for the limited purpose of developing the record regarding the quantitative results of Plaintiff's January 26, 2005 pulmonary function test." (Report at 330.) In the Report, Judge Pitman advised the parties that failure to file timely objections within fourteen days from the date of the Report would constitute a waiver of those objections. (Report at 332.) *See* 28 U.S.C. § 636(b)(1)(C); Fed R. Civ. P. 72(b). No party has filed objections to the Report, and the time to do so has now expired.

When no objections to a report and recommendation are made, the Court may adopt the report if there is no clear error on the face of the record. *See Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005); *La Torres v. Walker,* 216 F.Supp.2d 157, 159 (S.D.N.Y.2000). After conducting a thorough review of the record, the Court finds that Judge Pitman's well-reasoned and persuasive Report is not facially erroneous. Accordingly, the Court adopts the Report in its entirety. For the reasons set forth therein, IT IS HEREBY ORDERED THAT Defendant's motion for judgment on the pleadings is denied and that Plaintiff's motion for judgment on the pleadings is granted to the limited extent of remanding the matter to the Commissioner for further administrative proceedings consistent with Judge Pitman's Report. The Clerk of

the Court shall terminate the motions located at Doc. Nos. 12, 14, and 17 and close this case.

SO ORDERED.

### REPORT AND RECOMMENDATION

PITMAN, United States Magistrate Judge.

TO THE HONORABLE RICHARD J. SULLIVAN, United States District Judge,

### I. Introduction

Plaintiff Ernesto Rivera[1] brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Both plaintiff and defendant have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Docket Items 14 and 17). For the reasons set forth below, I respectfully recommend that defendant's motion be denied and that plaintiff's motion be granted to the extent of remanding the matter to the Commissioner for further proceedings consistent with this Report and Recommendation.

### II. Facts

#### A. Procedural Background

Plaintiff filed an application for DIB and SSI on October 31, 2003, alleging that he had been disabled since June 1, 2001[2] (Tr.[3] 17A, 44, 64, 73, 440, 447). In his initial application, plaintiff alleged that he was disabled due to liver disease (hepatitis C), a hernia, diabetes and asthma (Tr. 63; see Tr. 23, 452), and he later also alleged that he was disabled due to high blood pressure (Tr. 24–25, 453). The Social Security Administration denied plaintiff's application for benefits on December 26, 2003, finding he was not disabled (Tr. 17A, 18, 20). Plaintiff timely requested (Tr. 24–25) and was granted a hearing before an Administrative Law Judge ("ALJ") (Tr. 26, 39). The ALJ, Mark D. Newberger, conducted a video hearing on April 12, 2005 at which plaintiff was represented by attorney Erik Schryver (Tr. 10, 40, 444). Richard Baine, a vocational expert, also testified (Tr. 444, 464–68; see Tr. 31). The ALJ kept the record open after the hearing to allow plaintiff and his attorney to provide additional medical evidence, but they did not provide any such evidence (Tr. 10, 469–70). In a decision dated August 31, 2005, the ALJ found that plaintiff was not disabled at any time between June 1, 2001 and the date the opinion was issued (Tr. 7, 10, 17). Plaintiff requested review of the decision on October 28, 2005 (Tr. 6), and the ALJ's determination became the final decision of the Commissioner on January 3, 2006, when the Appeals Council denied plaintiff's request for review (Tr. 3).

Plaintiff commenced this action challenging this decision on January 27, 2006 (Compl. at 3). He alleged in his complaint that he was disabled due to "asthma, hepatitis, high blood [pressure], diabetes, [and] lung disease" (Compl. ¶ 4). The parties cross-moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure (Docket Items 14 and 17). Plaintiff requests a remand for further administrative proceedings pursuant to 42

---

1. Plaintiff commenced this action *pro se* (Compl.) but was represented by counsel starting in July 2007 (Docket Item 7).

2. Plaintiff alleges in his complaint that his disability began on December 2, 2003, when he received a pulmonary function test (Compl. ¶ 5).

3. "Tr." refers to the administrative record that defendant filed as part of his answer, as required by 42 U.S.C. § 405(g).

U.S.C. § 405(g), arguing that the ALJ violated the treating physician rule, failed to develop the medical record, failed to consider plaintiff's obesity and erroneously found that plaintiff could perform other jobs that existed in the national and regional economies (Amended Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings [4] ("Pl.'s Mem. in Support") at 1, 14–25).

Defendant argues that the Commissioner's decision complied with applicable laws and regulations and was supported by substantial evidence (Answer ¶ 12; Def.'s Mem. in Support at 15–25; Def.'s Mem. in Opp. at 2–8). Specifically, defendant argues in response to plaintiff's contentions that the ALJ's rejection of the opinions of two treating physicians in favor of the opinion of a consultative physician was justified, that it was appropriate for the ALJ to reject plaintiff's subjective reports of his limitations, that the ALJ fulfilled his obligations with regard to developing the medical record, that the ALJ considered plaintiff's obesity as required and that the ALJ properly concluded that there were other jobs plaintiff could perform in the national and regional economies (Def.'s Mem. in Opp. at 2–8).

### B. *Plaintiff's Social Background*

Plaintiff was born on April 24, 1963 (Tr. 17A, 44, 440, 448). He is separated from his wife, though still living with her (Tr. 86, 127, 448). Plaintiff has two children, who were 16 and 23 when the ALJ hearing occurred (Tr. 45, 449). Plaintiff attended school through either the ninth or tenth grade and does not have a G.E.D. (Tr. 67, 127, 449, 450). Plaintiff testified that his reading abilities are extremely limited and that he has a low I.Q. (Tr. 450).[5] As of the time of the ALJ hearing, plaintiff was receiving public benefits in the amount of $68 every two weeks as well as $140 a month in food stamps (Tr. 449; *see* Tr. 441). Plaintiff is covered by Medicaid (Tr. 449).

Plaintiff worked full-time as a sanitation laborer, picking up garbage in Manhattan's Bryant Park, from January 1 to March 1, 2001 (Tr. 64, 69, 451). Plaintiff also states that he worked full-time as a laborer in a "shade warehouse" for Microshade Corp. from January 1, 2001 to June 2001 [6] (Tr. 64–65, 69–70, 78). In this position, he measured and cut shades (Tr. 451). This job involved the use of "machines, tools, or equipment," but no writing, technical knowledge or technical skills (Tr. 64–65, 70–71). At this job, plaintiff spent about four hours a day walking and five hours standing, lifted a maximum of fifty pounds and frequently lifted ten pounds (Tr. 65, 71).

Plaintiff also worked as a construction laborer for a construction company called Procida in 1994 (Tr. 78, 451). On a work history report he completed for the Social Security Administration, plaintiff reported

---

**4.** Plaintiff submitted a memorandum of law in support of his motion for judgment on the pleadings on January 4, 2008, the day the parties' motions for judgment on the pleadings were due (*see* Docket Item 11). He also submitted an amended memorandum of law on January 7, 2008, the date to which defendant's deadline for submission of *its* memorandum of law was extended *nunc pro tunc* (*see* Docket Item 16). Defendant does not appear to object to the untimeliness of plaintiff's amended submission and in fact responds specifically to plaintiff's amended memorandum in his opposing papers. Accordingly, I shall consider plaintiff's amended memorandum in place of his initial submission.

**5.** Plaintiff stated at one point that he did attend special education classes, and at another point that he did not (Tr. 67, 450).

**6.** Presumably there is some error in the dates plaintiff reported, as he described both his position as a sanitation worker and his position as a laborer as full-time positions.

that this job involved carrying equipment and picking up cement, bricks and wood; that he walked or stood for seven hours a day; that he sat for one hour a day; that he stooped for seven hours a day; that he kneeled for two hours a day; that he crouched for two hours a day and that he lifted 100 pounds or more occasionally and 50 pounds frequently[7] (Tr. 79; *see* Tr. 87, 452).

Finally, plaintiff worked "off the books" for seven or eight months in 2000 and 2001 as a security guard at a clothing store (Tr. 452–53). This job involved both sitting and standing, as well as being both indoors and outdoors (Tr. 454).

### C. *Plaintiff's Medical Background*

#### 1. *Information Reported by Plaintiff*

Plaintiff reported that he lost his breath quickly and that he frequently experienced dull aching pain in his back, legs and stomach (Tr. 91, 94). In November 2003 plaintiff stated that he had been experiencing pain for almost two years and that it had been affecting his activities for about one-and-a-half years (Tr. 94). He reported that the pain increased when he was moving a lot or walking too much, and in general was brought on by walking, bending, sitting too long, or going up and down stairs (Tr. 87, 95). He stated that his pain affected walking and bathing but no other activities (Tr. 96). It typically lasted fifteen to twenty minutes and he took Codeine and aspirin to treat it (Tr. 95). He also wore an "Icy Hot" patch against his back, secured by a corset (Tr. 96).

Plaintiff reported that he could walk 100 yards without having to stop and rest, but that he would need to rest for 10 minutes before he continued walking (Tr. 92). He stated that he had asthma attacks about twice a month, brought on by heat, stress and walking too fast (Tr. 76). He stated that he went to the hospital frequently because of his illness (Tr. 97).

Plaintiff reported that his medications caused him to feel drowsy sporadically and that he had problems paying attention in general (Tr. 87, 92–93). Specifically, he asserted that he could not follow instructions and that he had trouble remembering things because his mind would "blank[ ] out" (Tr. 92–93).

Although plaintiff was able to iron and shop (Tr. 89–90), he reported that he generally did not do much house or yard work because of dizziness, weakness and shortness of breath (Tr. 89). His wife helped him with housework, cooking and cleaning (Tr. 88, 457). She also helped him bathe and dress after his umbilical hernia surgery (Tr. 87). Plaintiff stated that his conditions prevented him from going out with his family frequently and from playing sports (Tr. 91). He commented that he did go outside daily, that he could use public transportation, and that he attended his Methadone program daily (Tr. 89, 91). He indicated that his activities included crafts, chess, reading, taking naps, attending church, walking forty minutes per day at the recommendation of his doctor, doing chores and watching television (Tr. 87, 90–91, 96, 127).

#### 2. *Treatment Records*

##### a. *Lincoln Hospital*

Plaintiff has visited several physicians and clinics, as well as the emergency room ("ER") at Lincoln Medical and Mental Health Center ("Lincoln Hospital"). When visiting the clinics, he "kind of ro-

---

**7.** Based on the form's format and instructions, this information should correspond with plaintiff's job at Microshade Corp.; however, plaintiff's description of his duties in other parts of the record make it clear that this description actually pertains to his construction laborer position at Procida (*see* Tr. 78–79, 87).

tate[d] through and he [did not] see the same doctors every time" (Tr. 469).

### i. *Dr. Mogbonjubola Adeyemo*

The record contains notes from several visits with Dr. Mogbonjubula Adeyemo at Lincoln Hospital. The notes from the first visit are undated, but it appears to have occurred sometime prior to plaintiff's October 2003 umbilical hernia repair (Tr. 119 (noting "umbilical hernia—ref surg")). Although a substantial portion of the notes from this visit is illegible, Dr. Adeyemo noted that plaintiff was obese, that his chest was clear and that he had an umbilical hernia, hepatitis C, uncontrolled diabetes mellitus and uncontrolled hypertension (Tr. 119). The notes indicate that plaintiff occasionally choked at night and had been referred to a sleep study at Kings County Hospital but never went (Tr. 118–19). Dr. Adeyemo counseled plaintiff on diet, exercise and medication (Tr. 119).

Plaintiff saw Dr. Adeyemo for another visit on December 15, 2003, at which she noted plaintiff's obesity, diabetes mellitus, hypertension, "status post umbilical hernia" (repaired on October 23, 2003) and mild bronchial asthma (Tr. 298).

Plaintiff saw Dr. Adeyemo for another visit sometime after plaintiff's October 2003 umbilical hernia repair [8] (Tr. 290 (noting status post umbilical hernia)). The record of this visit notes plaintiff's diabetes mellitus, hypertension, hepatitis C, dyslipidema [9] and Methadone dependence (Tr. 290).

On May 26, 2004, Dr. Adeyemo completed a medical assessment of plaintiff's physical ability to do work-related activities (Tr. 141–44). She stated that she had seen plaintiff every two or three months and that his last visit had been on May 17, 2004

(Tr. 141). She gave treating diagnoses of morbid obesity, hypertension, umbilical hernia repair, hepatitis C and Methadone dependence (Tr. 141). Dr. Adeyemo found that plaintiff's symptoms at the time were chest tightness most nights and days and commented that he had recently started using Singulair and Advair (Tr. 141). She found that he was limited to carrying a maximum of five pounds occasionally and that he could stand or walk for a total of one hour in an eight-hour day (Tr. 142). She stated that she was "not sure" how long he could walk or stand without interruption (Tr. 142). She found that plaintiff's ability to sit was not affected by his impairments, that he could sit for six hours in an eight-hour day and that he could climb, stoop, kneel, balance, crouch and crawl occasionally (Tr. 143). In Dr. Adeyemo's opinion, plaintiff had no limitations in reaching, handling, seeing, speaking, feeling or hearing due to his impairments, but his conditions did limit his ability to push and pull (Tr. 143). She also found that plaintiff had no restrictions related to heights, moving machinery, vibration or noise, but that he was restricted from exposure to temperature extremes, fumes, chemicals, dust and humidity because they could aggravate his bronchial asthma (Tr. 144). Dr. Adeyemo indicated that all of these findings were supported by plaintiff's moderate bronchial asthma and that plaintiff's "[illegible] tolerance [was] limited by bronchial asthma symptoms" (Tr. 142–44). She stated that plaintiff "may do high activity as tolerated" (Tr. 144).

Plaintiff saw Dr. Adeyemo again on June 11, 2004, at which time she noted his diabetes mellitus, Methadone treatment, hepatitis C, status post umbilical hernia

---

**8.** Although the visit notes are undated, this visit may have occurred on May 17, 2004, given a reference to a visit on that date in Dr. Adeyemo's later assessment (*see* Tr. 141).

**9.** Dyslipidema (or "dyslipidemia") refers to abnormal amounts of lipids and lipoproteins in the blood. *Dorland's Illustrated Medical Dictionary*, 586 (31st ed. 2007) (*"Dorland's"*).

and bronchial asthma (Tr. 289). She also noted potential dyslipidemia (Tr. 289). She reported that he was recently seen in the ER for pain in his left groin which was probably the result of a strain (Tr. 289).

ii. *Dr. Robert Lee*

On September 17, 2002, plaintiff saw Dr. Robert Lee, a pulmonary specialist (Tr. 447), in the pulmonary clinic at Lincoln Hospital[10] (Tr. 124, repeated at Tr. 333). Dr. Lee noted plaintiff's bronchial asthma, hepatitis C and obesity and observed bilateral pedal edema (Tr. 124). Dr. Lee noted three to four ER visits per year due to asthma, with plaintiff's last admission in 2001 (Tr. 124). Plaintiff reported that he had lived with cats and dogs since childhood, but did not have carpets in his home (Tr. 124). On examination of plaintiff's lungs, Dr. Lee found no wheezing or crackling (Tr. 124). On a "flow sheet" completed during that visit, plaintiff reported that he sometimes wheezed, that he coughed at night, that he had trouble breathing on exertion and that he sometimes experienced tightness in his chest (Tr. 334). However, he stated that he did not experience fever or chest pain (Tr. 334).

Plaintiff denied nighttime symptoms but reported significant snoring which had increased over the two preceding years (Tr. 124). He stated that he occasionally choked in his sleep and his wife would wake him up (Tr. 124). He often fell asleep during the day but not while driving (Tr. 124). Dr. Lee's impressions were mild persistent asthma and potential obstructive sleep apnea (Tr. 124). He advised plaintiff to lose weight to participate in a sleep study at Kings County Hospital

(Tr. 124). At this visit plaintiff was also given educational information concerning asthma, including instructions on how to medicate himself in various circumstances and on techniques for using his inhaler and flowmeter (Tr. 335–38).

The only other visit notes corresponding to Dr. Robert Lee are from March 10, 2005 (Tr. 100). At this visit Dr. Lee appears to have given plaintiff an instructional sheet on how to self-treat his asthma, including various combinations of an Advair inhaler, Singulair, an Albuterol inhaler, a nebulizer and prednisone depending on the situation and the severity of the symptoms (Tr. 100).

On March 19, 2005, Dr. Lee completed a pulmonary residual function capacity questionnaire[11] for plaintiff (Tr. 434–36). He stated that he had started seeing plaintiff on September 17, 2002, although he did not mention how frequently he saw plaintiff after that (Tr. 434). He indicated diagnoses of diabetes mellitus, hepatitis C and bronchial asthma (Tr. 434). In the field where Dr. Lee was asked to describe the "clinical findings, laboratory and pulmonary function test results that show [the] patient's medical impairments," Dr. Lee referred to a pulmonary function test conducted on January 26, 2005 which showed "severe obstruction with bronchodilator response" (Tr. 434). Dr. Lee also noted blood gas study results from November 20, 2001 that indicated arterial $PCO_2$[12] of 65 and arterial $PO_2$[13] of 138 (Tr. 434). He opined that plaintiff's impairments were "likely to produce 'good days' and 'bad days'" (Tr. 435).

---

10. Many of the notes from this visit are illegible (*see* Tr. 124, repeated at Tr. 333).

11. Many of the fields on the questionnaire were inexplicably left blank (Tr. 434–36).

12. $PCO_2$ refers to the partial pressure of carbon dioxide in the blood. *See Dorland's* at 1419.

13. $PO_2$ refers to the partial pressure of oxygen in the blood. *Dorland's* at 1498.

Dr. Lee found that plaintiff could only walk three city blocks without needing rest or experiencing severe pain and that he could only stand for fifteen minutes at a time (Tr. 435). Dr. Lee stated that in an eight-hour workday, plaintiff could sit for a maximum of two hours, stand or walk for a maximum of two hours and lift ten pounds occasionally (Tr. 435–36). He found that plaintiff had no restrictions with regard to high humidity or "wetness" but that he should "avoid even moderate exposure" to extreme temperatures and dust, and that he should "avoid all exposure" to cigarette smoke, perfumes, soldering fluxes, solvents or cleaners, fumes, odors, gases and chemicals (Tr. 436). He opined, overall, that plaintiff's intermittent asthma and shortness of breath would "affect [his] ability to work at a regular job on a sustained basis" (Tr. 436). Despite these limitations, Dr. Lee's "Prognosis/Impressions" were "good" (Tr. 435).

iii. *Other Providers at Lincoln Hospital*

Plaintiff made several visits to Lincoln Hospital's infectious disease clinic in 2000. At his first visit, on February 28, 2000, he underwent various types of hepatitis tests and tested positive for hepatitis C (Tr. 365–66). He also received the first vaccination for hepatitis B (Tr. 365). Plaintiff visited the infectious disease clinic again on April 10, 2000, at which time he received another hepatitis B vaccination (Tr. 363–64). At this visit plaintiff complained of drowsiness and stated he wanted to decrease his dose of Methadone (Tr. 363). Plaintiff visited the clinic again on May 22, 2000 (Tr. 360). The notes from this visit indicate that plaintiff had hepatitis C and was in a Methadone program (Tr. 360). The plan outlined for plaintiff involved followup on his umbilical hernia, a gastroenterology referral, administration of the third dose of the hepatitis B vaccination by August 2000 and discontinuation of his visits to the infectious disease clinic (Tr. 360). Plaintiff's final documented visit to the in-fectious disease clinic was on July 3, 2000 (Tr. 356). It was noted that a hepatitis profile taken at his May 22, 2000 visit was within normal limits (Tr. 356). The notes also state that an HIV test done on January 19, 2000 was negative and that plaintiff's previous anemia had resolved (Tr. 356). Plaintiff was given a referral for "medicine" and a referral to the gastroenterology clinic (Tr. 356).

Plaintiff visited the dermatology clinic on July 6, 2000 where it was noted that he had a history of hepatitis B and C and had had an itchy rash on both his feet for six months (Tr. 359). The provider also reported that he had scaley plaques on the plantar surface of his toes on both sides (Tr. 359). The provider prescribed plaintiff a cream for his feet (Tr. 359).

Plaintiff saw Dr. Anita Alvarez, a resident in internal medicine, on July 5, 2002 (Tr. 342). She noted plaintiff's hepatitis C, his umbilical hernia, that he was a former IV drug user and that he attended a Methadone clinic (Tr. 342). Plaintiff complained of back pain and fatigue when walking, blaming his weight (Tr. 342). Dr. Alvarez observed bilateral expiratory wheezing and noted that plaintiff had had a bronchial asthma attack two weeks prior for which he was seen in the ER (Tr. 342). She noted that plaintiff was obese and referred him to a dietician (Tr. 342). She also ordered labs to check his hepatitis C viral load and to conduct certain liver tests (Tr. 342).

On August 16, 2002 plaintiff saw Dr. Anna–Maria Assevero, who noted that his problems included hepatitis C (with no detected virus at the time, however), bronchial asthma, Methadone dependence and an umbilical hernia (Tr. 126, repeated at Tr. 341). Plaintiff opined that his biggest issue was his weight (Tr. 126). He reported that he could not sleep at night, that he was tired during the day and that his

father had sleep apnea (Tr. 126). It was noted that plaintiff had an appointment with a dietician the following week; he was also referred to the obesity clinic (Tr. 126).

On October 10, 2002, plaintiff visited the endocrine/obesity clinic, referred by Dr. Alvarez, who noted in the referral that plaintiff had hepatitis C but no viral load and was morbidly obese at 322 pounds (Tr. 339). Dr. Tasneen Zehra at the clinic stated that plaintiff weighed 185 pounds in 1990 and had gained weight since starting a Methadone program in 2000 (Tr. 339). She discussed diet, activity, lifestyle, medication and surgery options with plaintiff and stated that he opted to try medication (Tr. 339A). Dr. Zehra also referred plaintiff to a dietician (Tr. 339A).

Plaintiff saw Dr. Chung Kim, the attending physician in infectious disease, on June 30, 2003 (Tr. 120, repeated at Tr. 321; *see* Tr. 121). The notes from this visit state that plaintiff had asthma, an umbilical hernia, "new onset" diabetes mellitus and hypertension (Tr. 120). It was also noted that plaintiff tested positive for "HCV RIBA" (hepatitis C) in 2000, but that no viral load was detected in 2002 (Tr. 120–21).

Plaintiff saw another provider, unidentified in the notes, at Lincoln Hospital on September 15, 2003 (Tr. 294). The record from this visit notes plaintiff's hypertension, diabetes mellitus, obesity and umbilical hernia (Tr. 294). The provider indicated that plaintiff had stable bronchial asthma and that he had been referred to the Kings County Sleep Study because of nighttime choking episodes, but that he had not complied with the referral (Tr. 294).

Plaintiff underwent a nutritional assessment by Monica Punohil, a certified dietician/nutritionist at Lincoln Hospital, on October 9, 2003 (Tr. 314). She noted morbid obesity reflected by plaintiff's Body Mass Index of 46.8 and the fact that he weighed 184% of his "Desirable Body Weight" (Tr. 314). She recommended that plaintiff avoid sweetened beverages and sugary fried foods (Tr. 314). She also advised plaintiff to increase his physical activity level and lower the amount of salt and fat in his diet (Tr. 314). She noted that plaintiff had high cholesterol, diabetes mellitus, bronchial asthma, a hernia, hepatitis C, anemia and hypertension (Tr. 314).

Dr. Adeyemo referred plaintiff to a podiatrist, whom he saw on January 6, 2004 (Tr. 299; *see* Tr. 300). The podiatrist noted plaintiff's asthma, hepatitis C, diabetes mellitus type II and hypertension and reported that he had elongated, dystrophic [14] toenails, that the bottoms of his feet were extremely dry and that he was experiencing itching between his toes (Tr. 299).

Plaintiff saw Dr. Sanjay A. Dhar on July 29, 2004 (Tr. 292). Dr. Dhar noted plaintiff's diabetes mellitus, asthma and hepatitis C and commented that his lungs were clear (Tr. 292). He referred plaintiff to a dietician and to hepatitis and asthma clinics (Tr. 292).

On September 10, 2004, plaintiff saw Dr. Jerzy Sikora for followup on his asthma (Tr. 283). The record from the visit notes plaintiff's moderate persistent bronchial asthma, which was controlled with medications, his diabetes mellitus, hypertension, hepatitis C and obesity, and that he was previously an intravenous drug user and quit in 1999 (Tr. 283). There was no shortness of breath, cough, phlegm or fever noted at the time (Tr. 283).

---

**14.** Dystrophia is "any disorder arising from defective or faulty nutrition," and when it affects the nails it involves changes in their color, texture and structure. *Dorland's* at 590–91.

The record also contains undated notes from a visit with Dr. Adisa Dzudza Sunjic (Tr. 122–23, repeated at Tr. 325–325A). Although much of the notes are illegible (Tr. 122–23), Dr. Dzudza Sunjic states that plaintiff was referred by the ER with newly diagnosed hyperglycemia and metabolic syndrome (Tr. 122). She observed his obesity, noting that he had gained 100 pounds the previous year, and recommended that he see a dietician and visit an obesity clinic (Tr. 122–23). She also noted hepatitis C, depression and impotence and stated that plaintiff was unemployed (Tr. 123). The record also contains referrals from this visit to "urology," the obesity clinic, the hepatitis clinic and the "eye" department or clinic (Tr. 326–29).

Plaintiff also saw Dr. Tranice D. Jackson on an unspecified date for a followup on his hepatitis C and obesity (Tr. 343). Plaintiff had no complaints other than his umbilical hernia and Dr. Jackson noted that his asthma was stable without any increase in exacerbation (Tr. 343). Dr. Jackson recommended that plaintiff exercise more and moderate his diet (Tr. 343).

### iv. Umbilical Hernia Repair

On June 14, 2002, plaintiff had an appointment with Dr. Kigongo in the surgery department after having been referred by the ER for his umbilical hernia (Tr. 348). The notes from the visit indicate plaintiff's morbid obesity, hepatitis C, asthma, chronic bronchitis and reducible umbilical hernia (Tr. 348). Dr. Kigongo stated that a surgical solution "carrie[d] an unacceptable risk of failure and complication" at that time and plaintiff was referred to primary care for his asthma and obesity (Tr. 348).

On September 26, 2003, plaintiff saw Dr. Kigongo again for evaluation of his umbilical hernia, which had been worsening (Tr. 117, repeated at Tr. 318). Diabetes mellitus, hypertension, obesity and hepatitis were noted (Tr. 117). Plaintiff reported that the hernia caused mild pain when lying on his stomach (Tr. 117). Dr. Kigongo recommended repair at that time because of the high risk of strangulation given the small size of the defect (Tr. 117). Plaintiff was examined on October 20, 2003 by an unidentified provider who cleared him for surgery (Tr. 312). Notes from this visit indicate that plaintiff suffered from hypertension, diabetes mellitus and "mild intermittent bronchial asthma" (Tr. 312).

Dr. Kigongo performed outpatient surgery to repair plaintiff's umbilical hernia at Lincoln Hospital on October 23, 2003 (Tr. 103, 105, 307–08). A pre-surgery examination the day of the surgery noted that plaintiff previously had surgery to repair an inguinal hernia on the right side (Tr. 310). The notes of the examination also indicate that plaintiff suffered from diabetes mellitus, bronchial asthma, hepatitis C and obesity (Tr. 310). The notes state that the umbilical hernia was reducible and that plaintiff was an acceptable risk for umbilical hernia repair (Tr. 310–11). His umbilical hernia was repaired with mesh while plaintiff was under general anesthesia (Tr. 307). After the surgery plaintiff was discharged with instructions to limit heavy lifting and to take Tylenol # 3 every four hours for pain (Tr. 103).

At a followup visit on November 18, 2003, plaintiff denied any nausea, vomiting, chills or pain but had mild serous drainage from the incision area (Tr. 116, repeated at Tr. 303). Plaintiff was advised not to lift more than thirty or forty pounds for another two weeks (Tr. 116).

### v. Emergency Room Visits

Plaintiff visited the ER at Lincoln Hospital for exacerbation of his asthma on May 23, 1995 (Tr. 278–81), April 30, 1998 (Tr. 271, 276), September 10, 1999 (Tr. 273–75), September 23, 1999 (Tr. 268–70), October 15, 1999 (Tr. 263–66), October 17, 1999 (Tr. 257, 261–62, 267), November 16,

1999 (Tr. 253–56), December 8, 1999[15] (Tr. 248–51, 353), December 12, 1999 (Tr. 252, 258–60, 353), March 26, 2000 (Tr. 243–46, 353), April 7, 2000 (Tr. 240–42; *see* Tr. 239), April 30, 2000 (Tr. 235–39), June 5, 2000 (Tr. 231–34), June 15, 2000 (Tr. 225–27, 353), August 11, 2000 (Tr. 212, 353), August 18, 2000[16] (Tr. 208–09, 353), December 26, 2000 (Tr. 196–97, 205, 353), July 14, 2001 (Tr. 198, 201–02), July 24, 2001[17] (Tr. 192–93), August 5, 2001 (Tr. 190–91), August 11, 2001 (Tr. 185–87, 214–15), August 25, 2001 (Tr. 180–81), August 27, 2001 (Tr. 176–77), September 23, 2001 (Tr. 170–71), October 1, 2001 (Tr. 166–67), October 11, 2001 (Tr. 164–65), November 20–21, 2001 (Tr. 412, 413–17) and June 21, 2002 (Tr. 112, repeated at 158). The exacerbations for which plaintiff visited the ER were "acute" on May 23, 1995 (Tr. 280), September 23, 1999 (Tr. 269), March 26, 2000 (Tr. 244), April 7, 2000 (Tr. 240), June 15, 2000 (Tr. 226), August 11, 2001 (Tr. 214), August 25, 2001 (Tr. 181) and October 1, 2001 (Tr. 167). At one visit, on August 5, 2001, the exacerbation was described as "mild" (Tr. 191).

Plaintiff's symptoms were typically some combination of wheezing, shortness of breath, coughing, production of white and/or yellow sputum and chest tightness (Tr. 113, 177, 181, 191, 193, 197–98, 201, 207, 214, 225–26, 231–32, 234–36, 238–40, 242–44, 246, 248–49, 256–58, 260, 262–65, 266–69, 273–74, 414–15). Frequently, ER staff would complete an "asthma flow sheet," tracking plaintiff's plaintiff's blood pressure, pulse rate, respiratory rate, temperature, oxygen saturation, peak flow, distress and wheezing over time while he was being treated with various medications (*see* Tr. 168, 174–75, 178–79, 182–83, 187–88, 194–95, 198, 203–04, 207, 211–12, 217, 225, 228–29, 231, 234–35, 238, 278, 279–80). On at least ten of plaintiff's twenty-eight visits to the ER for asthma, he walked out before treatment was complete, often against medical advice (Tr. 179, 181, 188, 192, 208–09, 215, 217, 264–65, 272, 276, 278, 280–81, 414–15, 417). Plaintiff was frequently instructed to lower his activity level for a few days following the exacerbation, to return to the ER if symptoms worsened and to visit the outpatient asthma clinic for followup (Tr. 112, 164, 166, 170, 189, 200, 237, 241, 250, 259, 261, 265, 270, 276, 355, 367, 369–71).

On November 20, 2001, plaintiff visited the emergency room for an exacerbation of his asthma and was admitted overnight (Tr. 412–17). He was experiencing wheezing, shortness of breath and high carbon dioxide levels (Tr. 414–15; *see* Tr. 420). Plaintiff was treated with a nebulizer[18] and Atrovent (Tr. 416). Arterial blood gas testing during this visit showed that plaintiff's PCO2 level was 65 and his PO2 level was 138—both of which are above normal (Tr. 420). A chest X-ray was performed with normal results (Tr. 418, 422). Various other tests were also performed at this visit, including an ECG test, an arterial blood glucose level test, a "urinalysis with reflex to microscopy," a basic metabolic panel and a hemogram (Tr. 419–21, 424–25). Plaintiff went home against medical

---

**15.** The exacerbation that led to this visit was triggered by his cutting sheet rock (Tr. 249).

**16.** The notes from this visit state that plaintiff had been working in a closed area with high humidity, which exacerbated his asthma (Tr. 208; *see* Tr. 207).

**17.** The notes from this visit indicate that plaintiff's asthma may have been exacerbated by the humid weather (Tr. 193). Plaintiff reported at this visit that he had regular asthma attacks two or three times a month that were controlled with his inhaler and medications (Tr. 193).

**18.** A nebulizer is "a device for creating and throwing an aerosol spray." *Dorland's* at 1253.

advice on November 21, 2001 (Tr. 415, 417).

Plaintiff also made several visits to the ER for reasons unrelated to his asthma. On June 20, 2000 he visited the ER for unspecified reasons, but was advised at this visit to take an antibiotic and Motrin for pain (Tr. 223, 353). On June 26, 2000, plaintiff went to the emergency room and received stitches for a laceration to his lip sustained as the result of a fall while "play fighting" with a friend (Tr. 218–20, 222, 353). On June 10, 2002, plaintiff went to the ER because he had experienced sharp, radiating abdominal pain at the site of his umbilical hernia the previous day, possibly as the result of a tight strap used during an MRI (Tr. 160–62). On April 14, 2003, plaintiff visited emergency services because at a recent physical his blood work revealed "high sugar" and he tested positive for diabetes (Tr. 110, repeated at 157; see Tr. 331). At this visit plaintiff was diagnosed with hyperglycemia (Tr. 110) and advised to avoid sugar and soda, drink plenty of water and return for a followup with the diabetic nurse in two days (Tr. 109, repeated at 156). On August 6, 2003, plaintiff visited the ER for right thigh/groin pain that began when he squatted to wash his dog (Tr. 106–07). The notes state that he had an inguinal hernia and was improving by the time of the visit (Tr. 107). Plaintiff visited the ER on June 1, 2004 for pain in his left groin that started after he stood up from a seated position (Tr. 148–50). Finally, he visited the ER on June 5, 2004 for musculoskeletal back pain that had lasted for five days (Tr. 145–47).

19. Hepatomegaly refers to enlargement of the liver. *Dorland's* at 857.

20. Echogenicity is the extent to which a structure gives rise to reflections of ultrasound waves. *Dorland's* at 596.

### vi. *Medical Tests*

In July 2002 plaintiff underwent an abdominal sonogram for evaluation of the upper right quadrant of his abdomen (Tr. 410). The examination found "hepatomegaly[19] and increased echogenicity[20] of the liver ... compatible with hepatocellular[21] disease or fatty infiltration" as well as an echogenic pancreas, "indicating fatty infiltration or chronic pancreatitis" (Tr. 410). The record also contains notations of periodic lab tests of plaintiff's blood and urine, but the records generally do not contain the results or their significance (see Tr. 432–33).

### b. *Methadone Program at Albert Einstein College*

Plaintiff began participating in a substance abuse program at Albert Einstein College of Medicine on August 9, 2001 (Tr. 437–38). As of April 11, 2005, he was attending the clinic five days a week for oral Methadone (Tr. 437). Dr. Jose Arroyo administered plaintiff's Methadone program and saw him daily (Tr. 98). Physician's Assistant Nancy Pagan completed a "Report on Substance Abuse" for plaintiff on March 7, 2005 (Tr. 438–39). She stated that she had been treating plaintiff since he was admitted to the program and that she saw him once a year for a physical exam and otherwise as needed (Tr. 438). She stated that plaintiff had no ongoing substance abuse issues[22] and that substance abuse played no role in plaintiff's current diagnoses of diabetes, hypertension, asthma, hepatitis C, a history of umbilical hernia and a history of depression (Tr. 438–39). She noted that he was "doing well in treatment" (Tr. 438).

21. Hepatocellular means pertaining to the cells of the liver. *Dorland's* at 856–57.

22. Plaintiff testified at the ALJ hearing that he last used illegal drugs in 2000 (Tr. 455).

### 3. *Medications*

As of his hearing on April 12, 2005, plaintiff was taking Glipizide, Metformin (a/k/a Glucophage), Prednisone, Pseudoephedrine and Methadone (Tr. 455–56). The record indicates that plaintiff took numerous other medications at various times, including: Advair, Albuterol (a/k/a Proventil or Ventolin), aspirin for his heart, Biaxin, Codeine Three, Metroprolol, Monopril, Motrin, Singulair, "TX" for hepatitis C, Vanceril and Viagra (Tr. 66, 67, 76, 98, 100, 111, repeated at 159, 118, 120, 124–27, 141, 167, 172, 181, 193, 289, 292, 294, 299, 310, 342, 360, 414, 435, 454). Plaintiff reported that his Methadone made him dizzy and that his Monopril caused a frequent need for urination (Tr. 67).

### 4. *Consultative Physicians*

#### a. *Dr. Stephen Rocker*

On December 3, 2003, Dr. Stephen Rocker, an internist, performed a consultative examination of plaintiff (Tr. 127–29). Plaintiff reported that his asthma started at age 28 and that his last wheezing episode was two months prior to the examination (Tr. 127). He stated that he experienced wheezing, sometimes lasting for one to two weeks, when exposed to cold weather or fumes (Tr. 127). Plaintiff complained that, due to his obesity and asthma, he could only walk two or three blocks before getting tired and short of breath (Tr. 127). Plaintiff did not need to go to the ER frequently (Tr. 127). At the time of the examination plaintiff had been diagnosed

with diabetes for five months (Tr. 127). He took an oral hypoglycemic and performed self-administered blood sugar tests at home, with results ranging from 180 to 230 milligrams per deciliter (Tr. 127). Plaintiff did not have polyphagia,[23] polyuria,[24] polydipsia,[25] visual impairment, paresthesias[26] or renal disorder (Tr. 127). Plaintiff had been diagnosed with hepatitis C for three years and experienced fatigue but had never had jaundice, abdominal distension, encephalopathy[27] or hematemesis[28] (Tr. 127). Plaintiff experienced knee pain when walking and standing and had experienced occasional swelling in his leg, but had never been treated for it (Tr. 127). Dr. Rocker also noted plaintiff's recent umbilical hernia repair (Tr. 127).

Dr. Rocker stated that plaintiff had a history of heroin use between the ages of 28 and 37 in the quantity of "one bundle" per day (Tr. 127). However, plaintiff denied any current drug use, alcohol use or cigarette smoking (Tr. 127). Plaintiff reported that he lived in an apartment with his ex-wife and spent his time doing chores and watching television (Tr. 127).

Dr. Rocker noted generally that plaintiff was "in no distress" and that he was not short of breath after walking to the examination room (Tr. 128). Dr. Rocker's physical examination revealed that plaintiff's lungs were "clear to percussion and auscultation"[29] with "[n]o wheezes, rhonchi or rales" (Tr. 128). A chest exam was negative and an X-ray revealed no acute lung

**23.** Polyphagia is "excessive eating." *Dorland's* at 1514.

**24.** Polyuria is "the passage of a large volume of urine in a given period." *Dorland's* at 1516.

**25.** Polydipsia is "chronic excessive thirst and intake of fluid." *Dorland's* at 1510.

**26.** Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formica-

tion, often in the absence of an external stimulus." *Dorland's* at 1404.

**27.** Encephalopathy is "any degenerative disease of the brain." *Dorland's* at 622.

**28.** Hematemesis is the vomiting of blood. *Dorland's* at 842.

**29.** Auscultation entails listening for sounds within the body, primarily to assess lung condition. *Dorland's* at 182.

pathology (Tr. 128, 133). Plaintiff underwent pulmonary function testing on the same day as Dr. Rocker's examination (Tr. 130). Dr. Rocker stated that "[e]ffort [wa]s good" and that the tests showed a "moderate obstructive and/or restrictive deficit with response to bronchodilator" (Tr. 128). Specifically, total forced vital capacity (FVC) was predicted at 4.61 liters and observed at 2.80/61 liters before bronchodilators and 3.12/68 liters after bronchodilators, and one second forced expiratory volume (FEV) was predicted at 3.80 liters per second and observed at 1.77/47 liters per second before bronchodilators and 2.16/57 liters per second after bronchodilators (Tr. 130). The notes indicate that the claimant was not in acute respiratory distress; neither was any wheezing evident on auscultation of the chest (Tr. 130).

An examination of plaintiff's heart showed a regular rhythm with no murmur or gallops (Tr. 128). Dr. Rocker commented that plaintiff's abdomen was soft and non-tender with no masses or organomegaly [30] and noted the scar from his recent umbilical surgery (Tr. 128). Dr. Rocker found no "clubbing,[31] cyanosis [32] or edema" in plaintiff's extremities and stated that "peripheral pulsations" were intact (Tr. 128). With regard to plaintiff's musculoskeletal system he found plaintiff's station and gait normal and observed that plaintiff had no problem standing up or getting on and off the examination table (Tr. 128). Plaintiff was able to use both hands and arms fully when dressing and undressing (Tr. 128). His knees and other joints had a full range of motion "without

deformity [and] without swelling, warmth or tenderness" (Tr. 128). Plaintiff had no muscular atrophy and was able to heel walk, toe walk and tandem walk (Tr. 128).

Dr. Rocker's impressions were obesity, history of asthma, history of diabetes mellitus (type II), no evidence of end organ damage, "hypertension noted today," history of positive hepatitis C serology, status post recent surgical correction of umbilical hernia, arthralgia of knees and history of drug abuse with current Methadone maintenance (Tr. 129). Dr. Rocker gave plaintiff an overall prognosis of fair (Tr. 129). He stated that plaintiff had no limitations in his speaking, hearing, sitting or handling abilities and a slight limitation in his standing, walking, lifting and carrying abilities (Tr. 129).

### b. Dr. Scott

On December 22, 2003, Dr. Scott, a disability claims adjudicator, completed a physical residual functional capacity assessment of plaintiff based on the evidence in the file (Tr. 134–39). Dr. Scott opined that plaintiff could lift or carry twenty pounds occasionally and ten pounds frequently and that plaintiff could stand, walk or sit for about six hours in an eight-hour workday (Tr. 135). Dr. Scott found that plaintiff's ability to push and pull was unlimited and that he had no postural, manipulative, visual or communicative limitations (Tr. 135–37). Dr. Scott opined that plaintiff was not limited with regard to extreme cold or heat, "wetness," humidity, noise, vibration, or hazards such as machinery or heights, but that he should avoid concentrated exposure to fumes,

---

**30.** Organomegaly is "enlargement of an internal organ." *Dorland's* at 1355.

**31.** Clubbing is "a digital deformity produced by proliferation of the soft tissues about the terminal phalanges of the fingers or toes, with no constant osseous changes." *Dorland's* at 381.

**32.** Cyanosis is "a bluish discoloration, especially of the skin and mucous membranes due to excessive concentration of deoxyhemoglobin in the blood." *Dorland's* at 460.

odors, dust and gases and should avoid poor ventilation (Tr. 137).

Dr. Scott noted that plaintiff had a metered-dose inhaler and that he alleged pain, shortness of breath and fatigue (Tr. 137). Dr. Scott stated, however, that plaintiff's claimed limitations were only "partially credible and not wholly supported by objective medical findings" (Tr. 137–38). Dr. Scott also indicated that treating or examining source statements in the file were not significantly different from his or her findings (Tr. 138). Dr. Scott's "explanation of determination" stated that plaintiff's past relevant work was medium under the classifications in the *Dictionary of Occupational Titles* and that the severity of his impairments precluded him from performing any of his past relevant work (Tr. 140). However, Dr. Scott stated that the severity of plaintiff's impairments did "not preclude [him] from engaging in [substantial gainful activity] at a light level" (Tr. 140).

### D. *Proceedings Before the ALJ*

The ALJ held a video hearing on April 12, 2005 at which plaintiff and Richard Baine, a vocational expert, testified (Tr. 444). Plaintiff first testified about his family situation and educational history (Tr. 448–50). He had been incarcerated in 1994 and again from 1995 to 1999 for selling drugs (Tr. 450–51, 460), and while in prison he was assigned to school rather than a job because of his low reading level (Tr. 460). He attended an "ADE" class which provided basic instruction in reading (Tr. 461). He stated that he could write his name and address but not a letter, but that his basic math and money handling skills were fine (Tr. 461). Plaintiff testified that he had been excused from working since he had been on public benefits (Tr. 461).

Plaintiff also testified regarding his prior positions as a warehouse laborer, sanitation laborer, construction worker and security guard[33] (Tr. 451–54). He reported that he left his position as a sanitation worker because of his umbilical hernia and asthma, stating "I started missing days because of my asthma, I started missing days, you know, on and off and basically they let me go" (Tr. 451–52). He left his position as a security guard at the clothing store because he was getting sick with asthma attacks "constantly" and his employer stopped tolerating his absences (Tr. 452, 454). Plaintiff stated that at this job he would sit when he grew tired from standing and would stand when sitting started to bother him (Tr. 454).

Plaintiff stated he was not able to work because he could not function, move around or walk very well (Tr. 453). He testified that when he bent over, he got dizzy due to his high blood pressure and that if he sat for over an hour his "right flank area" started hurting because of his hepatitis C (Tr. 453). Plaintiff stated he was "constant[ly]" bothered by his pain, for which he took Codeine # 3 and Motrin (Tr. 454). He stated that he had trouble carrying things because he would start wheezing and gasping for air (Tr. 453).

Plaintiff noted that he was on Glipizide and Metformin for his diabetes because he refused to take insulin due to his mother's bad experience with it (Tr. 455, 459). He stated that he also took Prednisone and pseudoephedrine (Tr. 455). He testified that his medications generally relieved his symptoms (Tr. 455), but that they also made him drowsy in combination with his Methadone (Tr. 455–56). Plaintiff stated that he tossed and turned constantly at night, that he slept around five or six hours a night and that he fell asleep often during the day (Tr. 456). He also testified

---

**33.** Plaintiff's duties in these positions are de- scribed in detail in Section II.B above.

that he had a lot of memory problems, especially with regard to his medication (Tr. 457).

Plaintiff stated that he and his ex-wife were still legally married but that they intended to separate or divorce (Tr. 457). His ex-wife helped him with housework and cooking and when he was ill she helped him get dressed (Tr. 457). When plaintiff went out—for example, to his medical appointments—his daughter or stepson often accompanied him (Tr. 458). Plaintiff testified that he was able to use public transportation and took the bus or train to his appointments, except when they were at the clinic directly across the street from his residence (Tr. 457–58). Plaintiff explained that he visited the Methadone clinic five times a week and picked up his doses for the weekend on Fridays (Tr. 459).

Plaintiff testified that his asthma attacks occurred three or four times a month and that he had to use his Albuterol inhaler six times a day (Tr. 461–62). He had a nebulizer machine at home which he used about four times a month when he got a bad asthma attack (Tr. 462). He stated that he had not owned the machine when he went to the hospital for asthma attacks in the past (Tr. 462). Plaintiff testified that he went to the emergency room at Lincoln Hospital about two times a month (Tr. 462).

The ALJ asked plaintiff "[i]f there was a job, let's say, an indoor job as a security officer in an office building where you'd, you'd be stationed generally behind a desk. . . . You could, you could be seated or standing at your own option, okay? . . . And people would come in, they would show you their identification and then if they had any questions about where something was located in the building like you could tell them what floor the office is located on, could, could you do that type of job now?" Plaintiff answered "I guess so.

I guess so." (Tr. 462–63). When asked if he had looked for any position similar to that, plaintiff stated he had not because he had so many doctors appointments, sometimes as many as three a week (Tr. 463).

Mr. Richard Baine, a vocational expert, also testified at the hearing (Tr. 465). Mr. Baine began by classifying plaintiff's past relevant work according to skill level and exertional level (Tr. 465). He stated that plaintiff's position as a construction laborer was at the heavy to very heavy exertional level and unskilled to semi-skilled, that plaintiff's work collecting trash would be classified as cleaner II, which has a medium exertion level and is unskilled, that plaintiff's position working in a factory would be classified as "assembler, small products" which is light and unskilled, and that plaintiff's retail security guard position was light and semi-skilled (Tr. 465).

The ALJ asked Mr. Baine to consider an individual of plaintiff's age with a ninth grade education but who tests at a "marginal education level" and is "restricted totally from medium to heavy exertion work, can perform some range of sedentary and light exertion work but subject to [certain] limitations," including being "restricted from high concentrations of gases, dust, fumes and similar pollutants" and that "[t]he person can only occasionally climb, balance, stoop, kneel, crouch and crawl" and is "restricted from temperature extremes and high humidity" (Tr. 665–66). Mr. Baine stated that this person would not be able to do any of plaintiff's past relevant work, either as he performed it or as those positions are performed in the national economy, although he qualified this by stating that if plaintiff's former security position was exclusively indoors and thus protected from temperature changes and fumes, the person would be able to perform that job (Tr. 466).

Mr. Baine noted that plaintiff had no skills that were transferable to sedentary or light work, but stated that there were sedentary and light unskilled positions that someone with of plaintiff's age, education, work background and RFC could do (Tr. 466). Such a person could not perform a "full range" of activities, but could perform packer, assembler or inspector positions, all of which existed in the regional and national economies (Tr. 467). The environmental limitations would limit somewhat the numbers of such positions that would be available, but there would still be 170,000 inspector positions nationally and 900 in the New York area that plaintiff could perform, 250,000 assembler positions nationally and 3,000 in the New York area that plaintiff could perform, and 250,000 packer positions nationally that plaintiff could perform[34] (Tr. 467). If the person was limited to sedentary work, the numbers would go down to 1,500 packers locally,[35] 60,000 inspectors nationally, 275 inspectors in the New York area, 80,000 assemblers nationally and 1,800 assemblers in the New York area (Tr. 467).

Mr. Baine stated that if plaintiff's testimony were found fully credible and consistent with the objective medical evidence in the record, he would not be able to perform these jobs, but that this was because he would be unemployable due to the number of doctors appointments he must attend (Tr. 468).

Mr. Baine also testified that if the residual functional capacity assessment completed by Dr. Lee were accurate, plaintiff would not be able to perform sedentary or light assembler, inspector or packer positions because he could not sit *or* walk for

more than two hours or perform full-time work (Tr. 468).

At the conclusion of the hearing plaintiff noted that he also saw other doctors at the clinic and that one was completing additional forms that had not yet been submitted to the Social Security Administration (Tr. 469). The ALJ stated that he would give plaintiff three weeks to obtain and submit additional records (Tr. 469). The ALJ also instructed plaintiff's counsel to submit a letter brief on the issue of whether plaintiff's asthma met the relevant listings in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 469). No letter brief from plaintiff appears in the record, however.

### III. Analysis

#### A. Applicable Legal Principles

##### 1. Standard of Review

[2, 3] The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); *Burgess v. Astrue*, 537 F.3d 117, 127–28 (2d Cir.2008); *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir.2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir.2000); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir.1999); *Bubnis v. Apfel*, 150 F.3d 177, 181 (2d Cir.1998). The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence. *Tejada v. Apfel, supra*, 167 F.3d at 773; *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir.1987); *Ellington v. Astrue*, 641 F.Supp.2d 322, 327–28 (S.D.N.Y.2009)

---

**34.** Mr. Baine did not specify how many packer positions there were in the New York area that were consistent with plaintiff's RFC of light and sedentary work with environmental limitations (*see* Tr. 467).

**35.** Mr. Baine did not specify how many packer positions there were in the national economy for individuals who could only perform sedentary work and had plaintiff's environmental limitations (*see* Tr. 467).

(Marrero, D.J.); *Santiago v. Barnhart*, 441 F.Supp.2d 620, 625 (S.D.N.Y.2006) (Marrero, D.J.). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue, supra,* 641 F.Supp.2d at 327–28; *accord Johnson v. Bowen, supra,* 817 F.2d at 986 ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."). However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." *Johnson v. Bowen, supra,* 817 F.2d at 986.

### 2. *Determination of Disability*

Under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.,* a claimant is entitled to disability benefits if he or she can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Walton,* 535 U.S. 212, 217–22, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (both impairment and inability to work must last twelve months). The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be

> of such severity that [the claimant] is not only unable to do his previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [the claimant] lives, or whether a specific job vacancy exists for [the claimant], or whether [the claimant] would be hired if [the claimant] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

■ The Commissioner must consider both objective and subjective factors when assessing a disability claim, including: (1) objective medical facts and clinical findings; (2) diagnoses and medical opinions of examining physicians; (3) subjective evidence of pain and disability to which the claimant and family or others testify; and (4) the claimant's educational background, age and work experience. *Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir.1999); *Rivera v. Schweiker,* 717 F.2d 719, 723 (2d Cir.1983).

"In evaluating disability claims, the [Commissioner] is required to use a five-step sequence, promulgated in 20 C.F.R. §§ 404.1520, 416.920." *Bush v. Shalala,* 94 F.3d 40, 44 (2d Cir.1996).

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where ... the claimant is not so engaged, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to do basic work activities.... Where the claimant does suffer a severe impairment, the third inquiry is whether, based solely on medical evidence, he has an impairment listed in Appendix 1 of the regulations or equal to an impairment listed there.... If a claimant has a listed impairment, the Commissioner considers him disabled. Where a claimant does not have a listed impairment, the fourth inquiry is whether, despite his severe impairment, the claimant has the residual functional capacity to perform his past work.... Finally, where the claimant is

unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Balsamo v. Chater,* 142 F.3d 75, 79–80 (2d Cir.1998); *see also Barnhart v. Thomas,* 540 U.S. 20, 24–25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003); *Butts v. Barnhart,* 388 F.3d 377, 383 (2d Cir.2004), *amended on other grounds on rehearing,* 416 F.3d 101 (2d Cir.2005); *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003); *Shaw v. Chater, supra,* 221 F.3d at 132; *Brown v. Apfel, supra,* 174 F.3d at 62; *Tejada v. Apfel, supra,* 167 F.3d at 774; *Rivera v. Schweiker, supra,* 717 F.2d at 722.

■■ Step four requires that the ALJ make a determination as to the claimant's residual functional capacity ("RFC"). *See Sobolewski v. Apfel,* 985 F.Supp. 300, 309 (E.D.N.Y.1997). RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). To determine RFC, the ALJ makes a "function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch." *Sobolewski v. Apfel, supra,* 985 F.Supp. at 309. The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work, and may be categorized as sedentary,[36] light,[37] medium, heavy or very heavy. 20 C.F.R. §§ 404.1567, 416.967; *see Rodriguez v. Apfel,* 96 Civ.

8330(JGK), 1998 WL 150981 at *7 n. 7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).

■ The claimant bears the initial burden of proving disability with respect to the first four steps. *Burgess v. Astrue, supra,* 537 F.3d at 128; *Green–Younger v. Barnhart, supra,* 335 F.3d at 106; *Balsamo v. Chater, supra,* 142 F.3d at 80. Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step—that the claimant's RFC allows the claimant to perform some work other than the claimant's past work. *Balsamo v. Chater, supra,* 142 F.3d at 80; *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986).

In meeting [his] burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's RFC in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.

*Gray v. Chater,* 903 F.Supp. 293, 297–98 (N.D.N.Y.1995) (Koeltl, D.J.). When a claimant retains the RFC to perform at least one of the categories of work listed on the Grid, and when the claimant's edu-

---

**36.** Sedentary work generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour workday. SSR 96–9p, 1996 WL 374185 at *3 (1996); *see* 20 C.F.R. §§ 404.1567(a), 416.967(a). Sedentary work also involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a).

**37.** "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds." 20 C.F.R. § 404.1567(b). Light work often "requires a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

cational background and other characteristics are also captured by the Grid, the ALJ may rely exclusively on the Grid in order to determine whether the claimant retains the RFC to perform some work other than his or her past work. *Butts v. Barnhart, supra,* 388 F.3d at 383 ("In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the [Grid]).") (internal quotation and citation omitted).

■■■ However, "exclusive reliance on the [Grid] is inappropriate" where non-exertional limitations "significantly diminish [a claimant's] ability to work." *Butts v. Barnhart, supra,* 388 F.3d at 383, *quoting Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir.1999) (internal quotation omitted); *Bapp v. Bowen, supra,* 802 F.2d at 603. When a claimant suffers from a non-exertional limitation such that she is "unable to perform the full range of employment indicated by the [Grid]," *Bapp v. Bowen, supra,* 802 F.2d at 603, or the Grid fails "to describe the full extent of [the] claimant's physical limitations," the Commissioner must introduce the testimony of a vocational expert in order to prove "that jobs exist in the economy which the claimant can obtain and perform." *Butts v. Barnhart, supra,* 388 F.3d at 383 (internal quotation and citation omitted from first quotation); *see* 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e); *see also Heckler v. Campbell,* 461 U.S. 458, 462 n. 5, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").

### 3. *Treating Physician Rule*

■■■ When considering the evidence in the record, the ALJ is required to give deference to the opinions of a claimant's treating physicians. Under the regulations' "treating physician rule," a treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in ... [the] record." 20 C.F.R. § 404.1527(d)(2); *Shaw v. Chater, supra,* 221 F.3d at 134; *Diaz v. Shalala,* 59 F.3d 307, 313 n. 6 (2d Cir.1995); *Schisler v. Sullivan,* 3 F.3d 563, 567 (2d Cir.1993). Before giving a treating physician's opinion less than controlling weight, the ALJ must apply various factors to determine the amount of weight the opinion should be given. These factors include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical support for the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6); *Schisler v. Sullivan, supra,* 3 F.3d at 567; *Mitchell v. Astrue,* 07 Civ. 285(JSR), 2009 WL 3096717 at *16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.) (adopting Report and Recommendation of Freeman, M.J.); *Matovic v. Chater,* 94 Civ. 2296(LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan. 12, 1996) (McKenna, D.J.). "[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight. 20 C.F.R. § 404.1527(d)(2); *Schisler v. Sullivan, supra,* 3 F.3d at 568; *Burris v. Chater,* 94 Civ. 8049(SHS), 1996 WL 148345 at *6 n. 3 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).

### 4. *Development of the Record*

■■■ "It is the rule in the [Second C]ircuit that 'the ALJ, unlike a judge in a trial, must [him]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" *Pratts v. Chater,* 94 F.3d 34, 37 (2d

Cir.1996), *quoting Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir.1982).

> Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record. *Echevarria v. Secretary of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir.1982). This duty exists even when the claimant is represented by counsel.... The [Commissioner's] regulations describe this duty by stating that, "[b]efore we make a determination that you are not disabled, we will develop your complete medical history ... [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." 20 C.F.R. § 404.1512(d).

*Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996); *see Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir.2004) ("We have stated many times that the ALJ generally has an affirmative obligation to develop the administrative record ....") (internal quotations and citation omitted); *Shaw v. Chater, supra*, 221 F.3d at 131 ("The ALJ has an obligation to develop the record in light of the nonadversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel."); *Tejada v. Apfel, supra*, 167 F.3d at 774 (same); *Van Dien v. Barnhart*, 04 Civ. 7259(PKC), 2006 WL 785281 at *14 (S.D.N.Y. Mar. 24, 2006) (same); *Molina v. Barnhart*, 04 Civ. 3201(GEL), 2005 WL 2035959 at *6 (S.D.N.Y. Aug. 17, 2005) (same). The regulations state that "[w]hen the evidence we receive from your treating physician ... or other medical source is inadequate for us to determine whether you are disabled, ... [w]e will first recontact your treating physician ... or other medical source to determine

whether the additional information we need is readily available." 20 C.F.R. § 404.1512(e); *see also Perez v. Chater, supra*, 77 F.3d at 47. Where the ALJ has failed to develop the record adequately, remand to the Commissioner for further development is appropriate. *See Pratts v. Chater, supra*, 94 F.3d at 39.

### B. *The ALJ's Decision*

The ALJ first noted that plaintiff met the disability insured status requirements of the Social Security Act on June 1, 2001, the alleged onset date of his disability (Tr. 16). The ALJ then applied the five-step analysis described above, relying on the medical evidence and plaintiff's testimony to determine that plaintiff was not disabled (Tr. 10–17).

#### 1. *Step One*

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since June 1, 2001, the alleged onset date of his disability (Tr. 11, 16).

#### 2. *Step Two*

At step two, the ALJ found that plaintiff had a severe impairment due to the combined effects of his diabetes mellitus (without end organ damage), hypertension, obesity, moderate obstructive and/or restrictive lung disease, asthma, history of positive hepatitis C serology, status post surgical correction of umbilical hernia, arthralgia[38] of the knees and history of drug abuse with current Methadone maintenance (Tr. 11, 16).

#### 3. *Step Three*

At step three, the ALJ found that none of plaintiff's physical or mental impairments, either singly or in combination, were severe enough to meet or medically equal the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 11–12, 16). He found that plaintiff's arthralgia of the knees did not meet listing 1.02

---

**38.** Arthralgia refers to pain in a joint. *Dor-land's* at 152.

because plaintiff is able to ambulate effectively (Tr. 11). *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.02(A) (defining impairment as major dysfunction of a joint resulting in inability to ambulate). He concluded that plaintiff's "moderate obstructive/restrictive lung disease" did not satisfy listing 3.02 because the evidence did not establish that his PCO2/PO2 levels were low enough (Tr. 11).

Next, the ALJ found that plaintiff's asthma did not satisfy the requirements of the relevant listing, contained in section 3.03, because he did not suffer from asthma attacks or chronic asthmatic bronchitis as defined in the listing—"prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting"—despite prescribed treatment and requiring physician intervention, and occurring at least every other month or, alternatively, six times a year (Tr. 11).

The ALJ also indicated that, while plaintiff had been diagnosed with hypertension, the record contained "no evidence of significant symptoms, clinical findings or functional limitations directly related to this condition that would satisfy the criteria for listing 4.03" (Tr. 11). Similarly, he found that although plaintiff had tested positive for hepatitis C, he did not meet the requirements of listing 5.05, which covers chronic liver disease, because there was no indication in the record that the hepatitis was or had ever been active and

testing did not reveal any viral load (Tr. 12). The ALJ found further that plaintiff's diabetes failed to satisfy the criteria of listing 9.08 because he was "not required to take Insulin and there [wa]s no evidence of neuropathy,[39] acidosis,[40] or retinitis proliferans[41]" (Tr. 12). *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 9.08 (requiring neuropathy, acidosis or retinitis proliferans).

He also noted that plaintiff's substance addiction was effectively controlled with his Methadone program and that it did not create any significant residual functional limitations (Tr. 12). The ALJ also considered the effects of plaintiff's obesity and stated that it did not combine with any of plaintiff's other conditions to create an impairment that would meet or equal any impairment in the listings (Tr. 12).

### 4. *Step Four*

At step four, the ALJ found that plaintiff had the RFC to perform sedentary and light work subject to certain nonexertional limitations (Tr. 14). The nonexertional limitations the ALJ identified were: (1) plaintiff could not be exposed to high concentrations of gases, dusts, fumes or similar pollutants; (2) plaintiff could not climb, balance, stoop, kneel, crouch or crawl more than occasionally; and (3) plaintiff could not be exposed to temperature extremes or high humidity (Tr. 14, 16). The ALJ's RFC determination was based on his assessment of plaintiff's credibility with regard to his subjective complaints and an assessment of various conflicting opinion testimony (Tr. 12–15).

First, the ALJ noted that although plaintiff made several visits to doctors and

**39.** Neuropathy is "a functional disturbance of pathological change in the peripheral nervous system." *Dorland's* at 1287.

**40.** Acidosis is "the accumulation of acid and hydrogen ions or depletion of the alkaline reserve (bicarbonate content) in the blood and body tissues, resulting in a decrease in pH." *Dorland's* at 17.

**41.** Retinitis proliferans is "a from intraocular hemmorhage, with formation of fibrous tissue bands from the surface of the retina." conditions sometimes resulting neovascularization and extending into the vitreous *Dorland's* at 1658.

the emergency room in 2001 and 2002 for exacerbations of his asthma involving wheezing, chest tightness and shortness of breath, he required treatment much less frequently from 2003 to 2005 (Tr. 12). He noted plaintiff's arterial PCO2 level of 65 and arterial PO2 level of 138 on November 20, 2001 and acknowledged that pulmonary function testing on January 26, 2005 revealed "severe obstruction with bronchodilator response" (Tr. 12). He also noted the diagnosis of diabetes, but pointed out that it was managed with oral medication rather than insulin and that there was no indication plaintiff had neuropathy, recurrent ulcers or wounds, retinopathy[42] or renal problems (Tr. 12). The ALJ also noted that plaintiff had not reported any pain in connection with his umbilical hernia since it had been surgically repaired (Tr. 12).

Evaluating plaintiff's subjective complaints, the ALJ noted that plaintiff reported attending a daily Methadone program, taking forty-minute walks, reading, doing crafts, playing chess, watching television and doing chores, but that plaintiff later claimed he could walk only 100 yards before resting for ten minutes, had difficulty with attention and memory, and could not perform yard work or cook because of dizziness, weakness and shortness of breath (Tr. 13). The ALJ also noted plaintiff's testimony that he experienced dizziness as a result of his high blood pressure, that he was weak due to his hepatitis and that his Methadone and other medication made him drowsy (Tr. 13). He stated that plaintiff testified that his ex-wife helped him with cooking, cleaning and caring for himself and that he traveled to his Methadone program daily using public transportation (Tr. 13). The ALJ further noted

plaintiff's testimony that his asthma prevented him from walking for very long, that he used his inhaler six times a day, that he had asthma attacks three or four times a month which required him to use a nebulizer and that his asthma attacks sent him to the emergency room about twice a month in the winter (Tr. 13). The ALJ also noted that plaintiff testified that he believed he could perform the duties of a security guard position in an office building if it had a sedentary exertion level (Tr. 13).

The ALJ found that some of plaintiff's testimony was not credible, concluding that his allegations regarding the limitations on his ability to work were inconsistent with the abilities demonstrated by his activities of daily living (Tr. 13–14). He concluded that plaintiff's daily activities of attending the Methadone program, taking forty minute walks, reading, doing crafts, playing chess, doing chores and watching television were not consistent with "wholly work preclusive limitations" (Tr. 14). The ALJ also found that plaintiff's alleged restrictions exceeded the limitations that his conditions could reasonably be expected to produce, based on the objective evidence and clinical findings (Tr. 13–14). The ALJ further emphasized plaintiff's statement at the hearing that he believed he could work in a sedentary security guard position at an office building (Tr. 14).

In addition to evaluating the plaintiff's credibility, the ALJ weighed the respective opinions of several physicians (Tr. 14–15). He accepted and gave significant weight to the opinions of consultative examiner Dr. Stephen Rocker that plaintiff had no limitations on his abilities to speak, hear, sit, or handle and had a slight limitation on his ability to stand, walk, lift and carry,[43] be-

---

42. Retinopathy refers to retinitis or retinosis. *Dorland's* at 1659.

43. The ALJ's decision also included a comprehensive description of Dr. Rocker's examination (Tr. 12–13). Dr. Rocker's findings are described in detail in Section II.C.4.a above.

cause, he found, they were consistent with the evidence in the record and plaintiff's reported activities (Tr. 14).

The ALJ gave only limited weight to the opinion of Dr. Scott, a disability claims adjudicator who found plaintiff had "limitations consistent with the full range of light work," stating that it deserved the level of weight appropriate for "other evidence" as it was not from an acceptable medical source (Tr. 14).

The ALJ briefly described treating physician Dr. Mogbonjubola Adeyemo's findings, including that plaintiff "had excessive tolerance to the inhaler and suffered from chest tightness most nights and days" and rejected her opinion that plaintiff was limited to lifting or carrying five pounds, standing or walking for one hour and sitting for six hours, that he was limited in his pushing and pulling ability, and that he could only climb, stoop, kneel, balance, crouch or crawl occasionally (Tr. 14). The ALJ's RFC determination does appear to have incorporated the portion of Dr. Adeyemo's opinion finding that plaintiff should avoid exposure to temperature extremes, humidity, fumes, chemicals and dust (Tr. 14; see Tr. 16).

The ALJ also rejected the opinion of treating physician Dr. Robert Lee that plaintiff was limited to standing and walking for two hours, was limited to sitting for two hours and could only lift ten pounds occasionally (Tr. 14). However, the ALJ's RFC determination incorporates Dr. Lee's opinion that plaintiff's exposure to extreme temperatures, dust, cigarette smoke, perfume, soldering fluxes, solvents or cleaners, fumes, odors, gases and chemicals should be limited (Tr. 14).

The ALJ rejected the portions of Dr. Adeyemo's and Dr. Lee's opinion concerning plaintiff's exertional capabilities because he found they were not supported by the evidence of record and in particular were not supported by Dr. Rocker's "de-tailed physical examination findings" (Tr. 14–15). He found that the exertional limitations suggested by Drs. Adeyemo and Lee were not consistent with Dr. Rocker's observations that plaintiff's lungs "were clear to percussion and auscultation, with no wheezes, rhonchi or rales," that plaintiff had "no clubbing, cyanosis or edema in the extremities," that plaintiff's "station and gait were normal," that plaintiff had "no difficulty transferring from a seated position or on/off the examining table," that plaintiff had "full use of both hands and arms in dressing/undressing," and that all of plaintiff's "joints had full range of motion without deformity, swelling, warmth or tenderness" (Tr. 15).

The ALJ also found that the opinions of Drs. Adeyemo and Lee were "inconsistent with [plaintiff's] admitted activities of daily living and appear[ed] to reflect [plaintiff's] self-reported limitations" (Tr. 15). He concluded further that the evidence in the record did not establish asthma severe enough to render plaintiff unable to work (Tr. 15).

Engaging in the analysis required by the treating physician rule, the ALJ also found that the physical limitations found by Dr. Adeyemo were not accompanied by clinical findings, and that the physical limitations of Dr. Lee were not supported by *detailed* clinical findings, but only brief explanations (Tr. 14–15). According to the ALJ, Dr. Adeyemo explained only that plaintiff's limitations were caused by his bronchial asthma and Dr. Lee explained only that "[p]atient has asthma and shortness of breath" (Tr. 14–15).

Having determined plaintiff's RFC, the ALJ then found that plaintiff could not perform any of his past relevant work, which included the positions of "cleaner II" (medium, unskilled work), assembler (light, unskilled work), construction laborer (heavy to very heavy, unskilled and semi-

skilled work) and clothing store security worker (light, semi-skilled work) (Tr. 15, 17).

### 5. *Step Five*

At step five, the ALJ found that there were several jobs that existed in significant numbers in the national economy that plaintiff could perform given his RFC, age, education and past work experience (Tr. 15). He noted that plaintiff was a "younger individual" at forty-two and that he had a limited ninth-grade education (Tr. 15–16). He mentioned that plaintiff's past work experience included unskilled and semi-skilled work and that he lacked any acquired work skills that would be transferable to the skilled or semi-skilled work functions of other positions (Tr. 15–16). Based on these vocational factors and the RFC determination permitting sedentary and light work, the ALJ found plaintiff was not disabled under 20 C.F.R. Part 404, Subpart P, Appendix 2 (Tr. 15–17). The ALJ found that plaintiff's RFC to perform sedentary and light work with the nonexertional limitations specified above would allow him to perform jobs such as packer, assembler and inspector, each of which could be performed at the light or sedentary level (Tr. 15–17). All of these jobs existed in the national and regional economies (Tr. 15, 17).

### C. *Analysis of the ALJ's Decision*
#### 1. *Legal Error*

As noted above, the first inquiry in a district court's review of a decision by the Commissioner is whether the Commissioner applied the correct legal principles in his determination. *Tejada v. Apfel, supra,* 167 F.3d at 773; *Johnson v. Bowen, supra,* 817 F.2d at 985; *Ellington v. Astrue, supra,* 641 F.Supp.2d at 327–28; *Santiago v. Barnhart, supra,* 441 F.Supp.2d at 625. Plaintiff argues that the ALJ's application of the legal standards was erroneous in several respects.

#### a. *Treating Physician Rule*

■ Plaintiff first argues that the ALJ's rejection of the opinions of Drs. Adeyemo and Lee violated the treating physician rule (Pl.'s Mem. in Support at 18–23). As an initial matter, plaintiff contends that the ALJ was not aware that Drs. Adeyemo and Lee were treating physicians, and because of this failed to apply the regulations governing the consideration of treating physicians' opinions (Pl.'s Mem. in Support at 18–19). Although plaintiff is correct that the ALJ's decision does not explicitly refer to Drs. Adeyemo and Lee as treating physicians, it is clear that he was aware they were treating physicians and considered them as such in his analysis. The ALJ's decision evaluated Dr. Adeyemo's and Dr. Lee's assessments in which Dr. Adeyemo reported she saw plaintiff every two or three months and Dr. Lee stated that he started seeing plaintiff three years prior to the assessment (Tr. 14–15, 141, 434). Further, the ALJ's analysis of Dr. Adeyemo's and Dr. Lee's opinions focused on whether they were consistent with the other evidence in the record and whether the conclusions were supported by clinical examination findings (Tr. 14–15)—the two primary inquiries required by the treating physician rule. *See* 20 C.F.R. § 404.1527(d)(2); *Shaw v. Chater, supra,* 221 F.3d at 134; *Diaz v. Shalala, supra,* 59 F.3d at 313 n. 6; *Schisler v. Sullivan, supra,* 3 F.3d at 567. Thus, although the ALJ did not expressly refer to them as such, his opinion strongly implies that he regarded Drs. Adeyemo and Lee as treating physicians.

■ Plaintiff next argues that the ALJ improperly discounted the opinions of Drs. Adeyemo and Lee, given their status as treating physicians (Pl.'s Mem. in Support at 19–23). He contends that the ALJ was incorrect when he concluded that Dr. Adeyemo's and Dr. Lee's opinions were not supported by clinical examination find-

ings (Pl.'s Mem. in Support at 19–20), and emphasizes that Dr. Lee noted the results of a recent pulmonary function test revealing a "severe obstruction" and that Dr. Adeyemo noted plaintiff's "chest tightness" and indicated that his asthma was exacerbated by fumes, dust and other pollutants (Pl.'s Mem. in Support at 20). Plaintiff also asserts that Dr. Adeyemo's and Dr. Lee's assessments were supported by clinical examination findings because plaintiff was treated several times in the Lincoln Hospital emergency room for exacerbations of his asthma and because notes from certain clinic visits indicate that plaintiff had bilateral wheezing (*see* Tr. 163, 177, 342) and edema (*see* Tr. 321, 333) (Pl.'s Mem. in Support at 20). Because neither treating physician participated in or referenced these emergency room or clinic visits, they do not constitute clinical findings adequate to support their assessments. Nevertheless, the ALJ does understate the clinical findings that were actually offered by Drs. Adeyemo and Lee to support their assessments. The ALJ claims Dr. Adeyemo stated only that plaintiff's limitations were caused by bronchial asthma (Tr. 15), but Dr. Adeyemo's assessment also explained that plaintiff experienced chest tightness most nights and days and noted his morbid obesity (Tr. 141). In addition, Dr. Adeyemo referred to previous visits with plaintiff during which she physically examined him (Tr. 141). The ALJ stated that Dr. Lee offered plaintiff's shortness of breath as the only explanation for the limitations he found, but in fact Dr. Lee (1) stated that plaintiff's impairments were supported by a pulmonary function test revealing "severe obstruction with bronchodilator response,"[44] (2) reported the results of a blood gas study and (3) noted plaintiff's

diabetes mellitus and hepatitis C (Tr. 434). Dr. Lee also described his ongoing treatment relationship with plaintiff, which included visits at which he physically examined plaintiff (Tr. 434).

▆▆▆▆ Notwithstanding the ALJ's failure to acknowledge the clinical findings Dr. Adeyemo and Dr. Lee offered in support of their conclusions, the ALJ validly rejected these physicians' opinions because they conflicted with plaintiff's admitted daily activities and other evidence in the record; thus, remand for reapplication of the treating physician rule is not appropriate (Tr. 14–15). *See Johnson v. Bowen, supra,* 817 F.2d at 986 ("where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration"). Plaintiff disputes the purported contradiction with his daily activities, suggesting that it was incorrect for the ALJ to rely on statements plaintiff made in his initial application and later written submissions, because at the *hearing* plaintiff stated that his wife helped him with daily activities such as cooking (Pl.'s Mem. in Support at 22–23). The significance of this distinction is unclear. For an ALJ to fully disregard allegations made by claimants in their application papers and other submissions but unconditionally accept the hearing testimony would not only render those documents largely futile, but would contravene 20 C.F.R. § 404.1512(b)(3), which requires that an ALJ consider statements a claimant makes to the Social Security Administration in applications and letters in addition to testimony in ALJ hearings. Additionally, plaintiff's testimony that his wife helped him with a few household tasks does not negate his prior admissions about his "wide range of daily activities,"

---

44. Defendant argues that because the "severe obstruction" responded to treatment with a bronchodilator without side effects, it did not support Dr. Lee's assessment (Def.'s Mem. in

Opp. at 4). However, a medical impairment that responds to treatment without lasting effect may still create limitations on an individual's ability to function in the workplace.

such as walking forty minutes a day, reading, doing crafts, playing chess and doing chores (Tr. 14). Although "a claimant need not be an invalid to be found disabled under the Social Security Act," *Balsamo v. Chater, supra,* 142 F.3d at 81 (internal quotations and citation omitted), an ALJ may properly consider a claimant's daily activities in evaluating the extent to which his symptoms interfere with his ability to work. *See* 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i).

■ The ALJ also found that the opinions of Drs. Adeyemo and Lee were inconsistent with the medical evidence in the record overall (Tr. 14–15).[45] The ALJ noted that plaintiff's asthma was only intermittent and his exacerbations were not frequent enough to preclude work (Tr. 15). This determination was supported by substantial evidence in the record, including a statement by Dr. Adeyemo that plaintiff had "mild intermittent bronchial asthma" (Tr. 312), plaintiff's own statement regarding the sporadic nature of his asthma flareups (*see* Tr. 76) and several instances in which medical providers noted that plaintiff's lungs were clear or that he had no wheezing or shortness of breath (*see, e.g.,* Tr. 119–20, 283, 292, 333, 342). Further, it appears that even when plaintiff was having an asthma attack his symptoms were not always of great severity, as he walked out of the ER before treatment was complete on more than a third of his visits (*see* Tr. 179, 181, 188, 192, 208–09, 215, 217, 264–65, 272, 276, 278, 280–81, 415, 417). He also skipped several of his scheduled appointments at the asthma clinic (*see* Tr. 284–86, 295–96, 349–51). In addition, the ALJ noted that Dr. Rocker found that plaintiff's lungs were clear, detected no wheezes, rhonchi or rales and found no impairments to plaintiff's extremities or problems with movement (Tr. 15).

■ Thus, despite his erroneous conclusion that Dr. Adeyemo's and Dr. Lee's opinions were not supported by adequate clinical findings, the ALJ properly declined to accord their opinions controlling weight because they were "inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 404.1527(d)(2); *Shaw v. Chater, supra,* 221 F.3d at 134; *Diaz v. Shalala, supra,* 59 F.3d at 313 n. 6; *Schisler v. Sullivan, supra,* 3 F.3d at 567. The ALJ "applied the substance of the treating physician rule" by considering the medical support for Dr. Adeyemo's and Dr. Lee's opinions and the consistency of their opinions with the other evidence in the record, *Halloran v. Barnhart, supra,* 362 F.3d at 32; 20 C.F.R. § 404.1527(d)(2)-(6), and gave "good reasons" for his rejection of their opinions. 20 C.F.R. § 404.1527(d)(2); *Schisler v. Sullivan, supra,* 3 F.3d at 568; *Burris v. Chater, supra,* 1996 WL 148345 at *6 n. 3. As long as he considered the factors set forth in the treating physician rule, the ALJ was entitled to weigh the conflicting opinion evidence and credit that which he found most persuasive. *Schaal v. Apfel,* 134 F.3d 496, 504 (2d Cir.1998). "It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses . . . ." *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983); *see also Mimms v. Heckler,* 750 F.2d 180, 186 (2d Cir.1984); *Aponte v. Sec'y, Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir.1984).

b. *ALJ's Development of the Medical Record*

■ Plaintiff also argues that the ALJ failed to develop the medical record as required by the regulations (Pl.'s Mem. in Support at 20–21). As noted above, the

---

**45.** Plaintiff does not specifically address the ALJ's conclusion that the opinions of Drs. Adeyemo and Lee were inconsistent with other evidence in the record.

ALJ has an affirmative obligation to develop the administrative record—even where, as here, the plaintiff was represented by counsel at the hearing. *See Halloran v. Barnhart, supra,* 362 F.3d at 31; *Shaw v. Chater, supra,* 221 F.3d at 131; *Rosa v. Callahan, supra,* 168 F.3d at 79; *Tejada v. Apfel, supra,* 167 F.3d at 774; *Pratts v. Chater, supra,* 94 F.3d at 37; *Echevarria v. Sec'y of Health & Human Servs., supra,* 685 F.2d at 755. However, because plaintiff was represented by counsel, the ALJ did not have the "heightened duty" to develop the record that exists when the claimant appears *pro se. See Echevarria v. Sec'y of Health & Human Servs., supra,* 685 F.2d at 755; *see also Bucci v. Apfel,* 98 Civ. 2372(RWS), 1999 WL 553787 at *5 n. 5 (S.D.N.Y. July 29, 1999).

Plaintiff argues specifically that the ALJ should have sought to obtain any additional clinical findings on which Dr. Adeyemo's and Dr. Lee's opinions were based, rather than relying (in part) on the lack of support from clinical findings to reject those opinions (Pl.'s Mem. in Support at 20–21). He cites *Schaal v. Apfel* for the proposition that "if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating source] *sua sponte*" (Pl.'s Mem. in Support at 21, *quoting Schaal v. Apfel, supra,* 134 F.3d at 505).

■ However, if Dr. Adeyemo or Dr. Lee based their opinions on any specific clinical findings beyond those listed (*see* Section II.C.1.a above), these findings would have been mentioned in their assessments, which were written on forms that specifically asked the author for "the medical findings that support this assess-

ment" (Tr. 142–44) and "the clinical findings, laboratory and pulmonary function test results that show your patient's medical impairments"[46] (Tr. 434). Furthermore, because the ALJ legitimately rejected both treating physicians' assessments for another reason (inconsistency with other substantial evidence in the record), the force of the clinical findings supporting them is ultimately of little consequence. *See Hogue v. Barnhart,* 03 Civ. 4963(SHS), 2005 WL 1036336 at *14 (S.D.N.Y. May 3, 2005) (Stein, D.J.) ("An ALJ need not seek further explanation from treating physicians each time there is an inconsistency in medical opinions.").

Although the ALJ was not required to make a general request that Dr. Adeyemo and Dr. Lee supplement the clinical findings on which they relied before he rejected their opinions, there is one piece of evidence identified by plaintiff which the ALJ should have attempted to obtain. The ALJ should have contacted Dr. Lee to obtain the actual quantitative results of the pulmonary function test that he cited, as the complete test results might have established that plaintiff's condition met listing 3.02 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (Pl.'s Mem. in Support at 21). Pulmonary function testing typically measures $FEV_1$ (forced expiratory volume in one second) and FVC (forced vital capacity), which can establish chronic pulmonary insufficiency under listing 3.02(A) or (B), as well as $PCO_2$ and $PO_2$, which can establish "chronic impairment of gas exchange due to clinically documented pulmonary disease" under listing 3.02(C)(2) or (3). 20 C.F.R. pt. 404, subpt. P, app. 1, § 3.02; *see* 20 C.F.R. pt. 404, subpt. P, app. 1, § 3.00(E).[47]

---

46. As noted above, Dr. Adeyemo's and Dr. Lee's functional assessments of plaintiff were generally supported by adequate clinical findings. In addition, the assessments were informed by the physicians' overall treatment history with plaintiff, records of which were

before the ALJ (*see* Tr. 100, 118–19, 124, 289–90, 298, 333–38; *see* Tr. 447).

47. Plaintiff would not be able to satisfy subsection 3.02(C)(2) of the listings in any event, as it requires that results meeting the speci-

It should have been clear to the ALJ that, while the quantitative results of the test were not included in the record, the January 26, 2005 test mentioned by Dr. Lee was likely to have yielded $FEV_1/FVC$ and/or $PCO2/PO2$ measurements. At step three the ALJ specifically addressed whether plaintiff's *prior* $PCO2/PO2$ measurements met listing 3.02 (Tr. 11), so he was plainly aware that pulmonary function test results had the potential to establish disability *per se* under listing 3.02.[48] The ALJ made no mention of any attempt to obtain the results of the January 26, 2005 pulmonary function test either at the hearing or in his opinion.

The quantitative results of the January 26, 2005 pulmonary function test would not be simply one more piece of evidence to consider in the weighing of physicians' opinions against other evidence in the record, and in fact would not necessarily change the ALJ's analysis under step four, but rather might contain figures that could, in conjunction with listing 3.02, automatically qualify plaintiff as disabled under step three.

 Plaintiff also asserts that the ALJ erred by failing to personally obtain additional recent treatment notes from Lincoln Hospital that plaintiff's counsel identified as missing from the record (Pl.'s Mem. in Support at 21). However, at the hearing the ALJ gave plaintiff's counsel three additional weeks to obtain and sub-mit these records, with the instruction to request more time if he needed it, and plaintiff's counsel failed to submit anything or to request more time (Tr. 10, 469). Courts do not necessarily require ALJs to develop the record by obtaining additional evidence themselves, but often permit them to seek it through the claimant or his counsel. *See Echevarria v. Secretary of Health & Human Servs., supra,* 685 F.2d at 756 ("[T]he proper course would have been to direct Echevarria to obtain a more detailed statement from the treating physicians ... before rejecting their pessimistic prognosis about his ability to work."); *Hankerson v. Harris,* 636 F.2d 893, 896 (2d Cir.1980) (the ALJ should have "advise[d] plaintiff that he should obtain a more detailed statement from his treating physician"). Accordingly, the ALJ's request that plaintiff's attorney obtain the recent treatment records from Lincoln Hospital fulfilled his obligations with regard to developing the record. In addition, putting aside the absence of quantitative results from the January 26, 2005 pulmonary function test,[49] it is not clear that the record, which is fairly voluminous, was inadequate to determine disability.

I, therefore, recommend that this matter be remanded for the limited purpose of developing the record regarding the quantitative results of plaintiff's January 26, 2005 pulmonary function test.

---

fied thresholds be obtained on at least two separate occasions, at least three weeks but no more than six months apart—and plaintiff's only other documented pulmonary function tests took place in 2001 and 2003 (Tr. 128, 130, 419–20). Furthermore, it is not clear whether PCO2 and PO2 were even evaluated as part of the 2003 testing (*see* Tr. 128, 130). Listing 3.02(C)(3), however, may be satisfied by one set of PCO2/PO2 measurements standing alone.

48. It is also noteworthy that while the 2003 pulmonary function test (yielding numbers too high to satisfy the listing) demonstrated a *"moderate* obstructive and/or restrictive deficit,"* the 2005 test revealed a *"severe* obstruction"* (Tr. 128, 434)-suggesting that the numbers from that test are likely to have been even lower, and thus more likely to satisfy listing 3.02.

49. With regard to the pulmonary function test, the ALJ did not seek this record himself *or* ask plaintiff's attorney to obtain it; in fact, he failed to even acknowledge its absence.

### c. ALJ's Consideration of Plaintiff's Obesity

■ Plaintiff next argues that the ALJ failed to consider the effects of his obesity as required by Social Security Ruling 02–1p (Pl.'s Mem. in Support at 23–24). SSR 02–1p notes that 20 C.F.R. Part 404, Subpart P, Appendix 1 has been amended to delete the listing for obesity but "remind[s] adjudicators to consider its effects when evaluating disability" and "instruct[s] [them] to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity." SSR 02–1p, 2000 WL 628049 at *1, *3 (2000).

The ALJ considered plaintiff's obesity explicitly at steps two and three. At step two, he found that plaintiff had a severe impairment due to the combined effects of his various conditions, including his obesity (Tr. 11, 16). At step three, the ALJ noted that he had considered the effects of plaintiff's obesity and found that it did not, in combination with any of plaintiff's other conditions, create an impairment that would meet or equal any impairment in the listings (Tr. 12). The ALJ did not explicitly consider the independent effects of plaintiff's obesity in his analysis at step four, but he evaluated plaintiff's physical functional limitations in a comprehensive manner that would have incorporated the effects of plaintiff's obesity to the limited extent they were evident from the record, primarily as they were intertwined with the effects of his other conditions (see Tr. 12–16). Notably, he gave careful consideration to both Dr. Adeyemo's and Dr. Rocker's reports, both of which reported plaintiff's obesity (Tr. 12, 14–15). At step five, the ALJ used the RFC he found at step four, which took plaintiff's obesity into account (Tr. 15–17).

### d. ALJ's Analysis at Step Five

■ Plaintiff claims that at step five the ALJ did not properly identify positions in the national and regional economies that someone with plaintiff's specific RFC could perform because he only identified the broad categories of packer, inspector and assembler, which, plaintiff claims, include positions involving a range of skill levels, exertional levels and environmental conditions (Pl.'s Mem. in Support at 24–25). Accordingly, plaintiff claims, the ALJ failed to establish that there were significant numbers of specific jobs that plaintiff could actually perform in the national or regional economies (Pl.'s Mem. in Support at 24–25).

However, the ALJ based his finding regarding the numbers of possible positions in the regional and national economies on the testimony of the vocational expert, who explicitly stated that packer, assembler and inspector positions existed that would be unskilled and would have a sedentary or light exertion level (Tr. 467). He narrowed the category from *all* packers, assemblers and inspectors to those at the sedentary and light levels, stating that the numbers he would give would be "modified and won't be the full range of numbers" (Tr. 467). He also adapted the numbers based on plaintiff's nonexertional (environmental) limitations (Tr. 467). The ALJ's opinion, in turn, notes numbers of packer, inspector and assembler jobs at both the sedentary and light levels and states that these numbers correspond to the positions plaintiff could actually perform given his nonexertional limitations (Tr. 17). Thus, plaintiff's argument is without merit.

### 2. Substantial Evidence

Because I find legal error requiring remand, I need not consider whether the ALJ's decision was otherwise supported by substantial evidence. *See Johnson v. Bowen, supra,* 817 F.2d at 986; *Ellington v.*

*Astrue, supra,* 641 F.Supp.2d at 328. In any event, plaintiff does not argue that the ALJ's decision was not supported by substantial evidence (*see generally* Pl.'s Mem. in Support).

## IV. *Conclusion*

Accordingly, for all the foregoing reasons, I respectfully recommend that defendant's motion for judgment on the pleadings be denied and that plaintiff's motion for judgment on the pleadings be granted to the limited extent of remanding the matter to the Commissioner for further administrative proceedings consistent with this Report and Recommendation.

## V. *Objections*

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from the date of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Sullivan, United States District Judge, 500 Pearl Street, Room 640, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Sullivan. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS *WILL* RESULT IN A WAIVER OF OBJECTIONS AND *WILL* PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988);

*McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).